UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TASHA ALEXANDER, | : | Case No. 1:11-cv-295 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| TRILOGY HEALTH SERVICES, LLC, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 22) IS DENIED; AND (2) PLAINTIFF'S PARTIAL MOTION FOR
SUMMARY JUDGMENT (Doc. 23) IS GRANTED**

This civil action is before the Court on the parties' cross motions for summary

judgment (Docs. 22, 23) and responsive memoranda (Docs. 25, 26, 27, 28).

## I.    BACKGROUND FACTS

Plaintiff Tasha Alexander filed this civil action against Defendant Trilogy Health

Services, alleging claims for: (1) pregnancy discrimination under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and Ohio Revised Code Chapter 4112

(Counts II and III); (2) disability discrimination under the Americans with Disabilities

Act, 42 U.S.C. § 12112 *et seq*. and Ohio Revised Code Chapter 4112 (Counts IV and V);

and (3) interference under the Family Medical Leave Act, 29 U.S.C. § 2617 (Count I).

Plaintiff moves for partial summary judgment on the disability discrimination and FMLA

claims and Defendant moves for summary judgment on all claims.

## II.    UNDISPUTED FACTS

### A.    Background

Trilogy is a large health services company that operates 68 nursing homes and other residential care facilities in Ohio, Kentucky, Indiana, Michigan, and Illinois. Plaintiff Tasha Alexander began working for Trilogy on May 6, 2009, as a licensed practical nurse ("LPN") at Trilogy's Triple Creek facility in Cincinnati, Ohio.  (Doc. 21 at 10).  Plaintiff received her nursing license in 2009, but had worked in the health care field as a state tested nurse's aide for a number of years.  (*Id.* at 10-13).  After graduating from nursing school, Plaintiff found an opportunity with Trilogy at Triple Creek Retirement Community.  (*Id.* at 24).  In her position, Plaintiff reported directly to the Assistant Director of Nursing at the Triple Creek facility, Cheryl Henderson.  (*Id.* at 30).  Melanie Crozier served as the Director of Nursing at Triple Creek during Plaintiff's tenure.  (Doc. 20 at 8).

At the outset of Plaintiff's employment with Trilogy, the Company gave her training on its policies and procedures.  (Doc. 21 at 15-23).  Plaintiff signed for and received Trilogy's Employee Handbook.  (*Id.* at 15-23).  The Handbook set forth the Company's Attendance Policy which notes that "an employee must notify the supervisory as far in advance as possible, but not later than (4) fours before the scheduled starting time if the employee expects to be late or absent."  (*Id.*, Ex. 2 at 19).  Trilogy's Disciplinary Action Policy in the Employee Handbook states that upon a fourth disciplinary offense, an employee would be terminated "as deemed appropriate in the sole

discretion of the Company." (*Id.* at 16).  The Handbook also noted that to initiate FMLA leave, employees were required to obtain information from its Human Resources personnel.  (*Id.* at 43).  Trilogy also posted information regarding FMLA leave in posters in the employee break room at its Triple Creek location.  (Doc. 19 at 12).

On January 25, 2010, Plaintiff received an initial Employee Counseling Record Form ("Employee Counseling") because she had "not maintained [an] acceptable attendance record" and had accumulated thirteen occurrences, seven for being late to work and six for being absent from work.  (Doc. 21 at 24, 31, Ex. 19).

On April 24, 2010, Cheryl Henderson, Triple Creek's Assistant Director of Health Services, wrote: "Tasha is a wonderful nurse, loves her residents, and her team.  Tasha is a team player. . . . She follows direction [and] pays attention to details. Tasha leads by example [and] always encourages her co-workers. Tasha is a very well rounded nurse, that truly lives the Trilogy culture. She is a devoted staff member."  (Doc. 18, Ex. 1). Plaintiff substantially improved her attendance in the Spring of 2010.  (*Id.* at 12). Pursuant to company policy, her attendance record was wiped clean on her one-year anniversary with Trilogy, May 6, 2010.  (Doc. 18 at 41; Doc. 17 at 25).

Plaintiff learned that she was pregnant in or about May 2010, and informed Trilogy soon after.  (Doc. 23, Ex. 1 at ¶ 2; Doc. 18 at 21-22).  At about the same time, another nurse at Triple Creek, Stephanie Ware, also became pregnant.  (Doc. 18 at 23). Ms. Ware and Plaintiff shared a position, performing the same job on different days.  (*Id.* at 22).  Plaintiff and Ms. Ware each worked the night shift as the sole nurse on two wings

at Triple Creek.  They were responsible for the care of approximately 30 residents – often without any support from nursing aides.  (Doc. 24 at 11; Doc. 23, Ex. 1 at ¶ 3).  Both were scheduled to take maternity leave at the same time.  (Doc. 24 at 16-17).

In June 2010, Trilogy hired a new Director of Health Services at Triple Creek, Melanie Crozier.  (Doc. 20 at 8).  The Director of Health Services was responsible for overseeing all aspects of the nursing department, including personnel issues, clinical issues, family concerns, and regulatory compliance.  (*Id*. at 10).  Shortly after Ms. Crozier started at Triple Creek, Plaintiff was subjected to a number of disciplinary actions, including actions dated July 8, 2010, August 5, 2010, and August 18, 2010.  (*Id.* at 26, 28, and 54).  The ultimate result of these three warnings was that Plaintiff was placed on a final written warning.  (*Id.* at 42; 55-56).

Specifically, on July 8, 2010, Plaintiff received an Employee Counseling for giving a resident the wrong mediation.  (Doc. 21 at 33-34, Ex. 20).  In that instance, Plaintiff left the incorrect medicine at the bedside of a resident.  (*Id.*, Ex. 20).  The resident realized Plaintiff's mistake before taking the medication.  (*Id.*)  In completing the Employee Counseling for this incident, Ms. Henderson noted that it was a "Written Warning due to severity."  (Doc. 18).  In both the January and July 2010 disciplinary actions, Trilogy indicated to Plaintiff that further violation of work rules/policies could result in her termination.  (Doc. 21 at 34).

On August 5, 2010, Plaintiff received another Employee Counseling when she failed to give a resident pain medication, after the resident had requested it two times.

(Doc. 21 at 34, Ex. 21).  In that Employee Counseling, Plaintiff acknowledged her mistake and handwrote on the Counseling that she would show improvement: "Pain medication will be given in a timely manner." (*Id*.)  On August 18, 2010, Trilogy initiated another Employee Counseling for Plaintiff taking several hours to respond to a resident complaining of chest pain. (*Id*. at 35, Ex. 22).  Crozier indicated that the August 18, 2010 Counseling was Plaintiff's: "Final Written Warning." (*Id*.)  In response, Plaintiff told Crozier that she could not handle her workload. (*Id*.)  Crozier agreed to move Plaintiff to a different hall and shift. (*Id*.)  In the two August Employee Counselings, Trilogy continued to note that further violation of the rules could result in termination. (Doc. 21 at 35).

**B.     August 23, 2010**

On August 23, 2010, Plaintiff was scheduled to work beginning at 7:00 p.m. (Doc. 21 at 36).  She was also scheduled to attend an in-service training meeting that afternoon, which was set to begin at 2:30 p.m. (*Id*.)  Although Plaintiff had been feeling ill that day, she drove to the facility for the training meeting. (*Id*. at 36-37).  She clocked in at 2:33 p.m., but the meeting had already started and she was excluded from it. (Doc. 23, Ex. 2; Doc. 21 at 36).  She then went to speak with Cheryl Henderson, the Assistant Director of Health Services, about her shift that evening.  She informed Ms. Henderson that she was feeling ill, and that her son was also sick, so she would not be able to work her shift that evening, which was scheduled to begin at 7:00 p.m. (Doc. 21 at 36-37).

-5-

Ms. Henderson noted that Plaintiff appeared to be preeclamptic that day.  (Doc. 23, Ex. 1 at ¶ 4; Doc. 18 at 62).  After speaking with Ms. Henderson, Plaintiff clocked out at 2:55 p.m.  (Doc. 23, Ex. 2)

### C.  August 24, 2010

The next day, August 24, 2010, Plaintiff had a regularly-scheduled examination with her obstetrician at 4:00 p.m.  (Doc. 21 at 38).  She had been feeling better than the day before and planned on working her regularly-scheduled shift that evening at 7:00 p.m. (*Id.* at 39).  During the examination, testing revealed that Plaintiff had an elevated protein level in her urine and that her blood pressure was 180/100, which was dangerously high. (Doc. 21 at 39; Doc. 18 at 67; Doc. 23, Ex. 3 at ¶ 3).  Based on the test results, Plaintiff's physician instructed her not to report to work that evening, placed her on medication, and sent her for additional testing.  (Doc. 21 at 39-40).

Before she underwent the additional testing, Plaintiff called Ms. Henderson to inform her that her physician had instructed her not to work that evening due to high blood pressure.  (Doc. 21 at 40; Doc. 18 at 64-65).  Plaintiff called off at 4:50, outside the four hour requirement, so Henderson and Crozier noted the call-off as a violation of the rule.  (Doc. 21 at 41, Doc. 20 at 50).  Plaintiff's physician prepared a work excuse, which an office assistant sent to Triple Creek via facsimile that evening, stating that Plaintiff could not work "due to elevated BP in pregnancy." (Doc. 19, Ex. 31; Doc. 23, Ex. 5 at ¶ 3).

-6-

**D.  August 25, 2010**

The following day, Plaintiff was scheduled for a slate of testing both with her obstetrician and with an independent testing facility.  Plaintiff placed a call to Ms. Dressler, Triple Creek's AP Payroll Coordinator, to request the necessary paperwork to take FMLA leave.  (Doc. 21 at 44).  Ms. Dressler informed Plaintiff that she needed to obtain the requisite FMLA paperwork from Trilogy's third-party FMLA administrator, Matrix.  (*Id*.)  Plaintiff maintains that Ms. Dressler informed her that she needed to visit Matrix's website to obtain the paperwork.[1]  (*Id*.)  Plaintiff visited the website, but was unable to locate the proper paperwork.  (*Id.* at 44-45).  The proper method for contacting Matrix was through a telephone number, not a website, and no FMLA paperwork was available on Matrix's website.  (Doc. 17 at 9).

Trilogy's handbook contained an FMLA policy requiring its employees to provide written notice of their need for a leave of absence, but the policy contained in the handbook was not the policy in effect at that time.  (Doc. 17 at 21).  Although the policy in the handbook directs employees to contact the facility's business office to obtain the necessary FMLA request form, Trilogy had changed its policy when it retained a third-party FMLA administrator.  Trilogy did not, however, update its employee handbook or provide any other notice to its employees of the new procedure for requesting FMLA leave through Matrix.  (Doc. 17 at 23; Doc. 19 at 12).

---

[1]  Ms. Dressler testified that she has no independent recollection of her conversation with Plaintiff on August 24, 2010.  (Doc. 17 at 29).

### E.       August 26, 2010

On August 26, 2010, Ms. Crozier, Triple Creek's Director of Health Services, and

Ms. Henderson, Triple Creek's Assistant Director of Health Services, called Plaintiff to

discuss her absence on August 24, 2010. (Doc. 21 at 46). Ms. Crozier informed Plaintiff

that her failure to give four hours of notice for her absence on August 24, 2010,

constituted a voluntary resignation of her position. (Doc. 21 at 46; Doc. 20 at 62; Doc.

18, Ex. 10). Ms. Crozier then asked Plaintiff to come into the facility to discuss the

matter, but Plaintiff declined to do so because her obstetrician did not clear her to return

to work until the following day. (Doc. 23, Ex. 1 at ¶ 5). According to Ms. Crozier,

Plaintiff stated: "there's no point [to coming in to the facility] because the decision's

already been made." (Doc. 20 at 46).

Ms. Crozier testified that she told Plaintiff she was taking her off the schedule and

would suspend her pending an investigation of her failure to provide more than four hours

of notice of her inability to work on August 24, 2010. (Doc. 20 at 41, 46). Trilogy

suspended Plaintiff and initiated an investigation. (Doc. 21 at 50; Doc. 20 at 63). Trilogy

did not terminate Plaintiff at that point, nor did it consider her to have resigned by

refusing to come into the facility. (Doc. 20 at 63). That same day, Plaintiff applied to the

Ohio Department of Job and Family Services to receive unemployment compensation

benefits. (Doc. 21 at 61).

Ms. Crozier and Plaintiff agree that Plaintiff stated during that August 26, 2010,

telephone call that she was protected under the Pregnancy Discrimination Act and that she

was taking a leave of absence under the FMLA.  (Doc 20 at 52-53).

Following her telephone conversation with Ms. Crozier on August 26, Plaintiff submitted a plea for assistance to Trilogy's compliance department via email.  She wrote as follows:

> Hello. My name is Tasha Ott and I am a LPN at Triple Creek Retirement Community.  On 8-23-10 & 8-24-10 I was forced to call off of my shift due to a serious medical condition.  My physician actually removed me from duty until 8-27-10.  I am blessed to be five months pregnant but unfortunately I have developed extremely high blood pressure.  My blood pressure on the days in question was stroke level at 180/100.  As such my obstetrician believed that my life as well as the baby's were in danger enough to remove me from duty to start me on medication. Today I returned to my doctor and my blood pressure continues to be high and my lab work came back confirming kidney damage. Today, 8-26-10, I was also fired for not giving 4 hours notice when my physician removed me from duty.  I explained that since my appointment was not until 4 p.m. I could not predict four hours in advance that my physician would remove me from duty.  Melanie, our DHS, replied that was basically to [sic] bad because the policy states that I have to give four hours notice. I asked her if all employees were held to this practice and she didn't know the answer to that.  I then asked her about the fact that I had a physicians [sic] order due to a life threatening medical condition relating to my pregnancy, she replied it didn't matter.  I then told her that I had read the Pregnancy Discrimination Act of 1978 and that this was a violation of my rights. Especially considering that I know that the other employees of the facility are not held to this policy. Therefore it is a direct violation of Title VII of the civil rights act of 1964.  I am able to provide documentation from my physician regarding my health and unavoidability of my call off.  I have been with this company since May of 2009. I could never have imagined that I would be punished for having a child with my husband and

(Doc. 20, Ex. 17).  Trilogy received this email on August 26, 2010, and subsequently initiated an investigation.  (Doc. 19 at 19).

F.    **Trilogy's Investigation**

Linda Lawrence, a member of Trilogy's employer relations support team, conducted the investigation for Trilogy.  (Doc. 19 at 18).  At the outset of her investigation, Ms. Lawrence twice remarked that she had concerns that Plaintiff was suspended due to a pregnancy-related absence.  On August 26, 2010, Ms. Lawrence wrote in an email to one of Trilogy's divisional vice presidents: "I have concerns that she was pregnant."  (Doc. 19, Ex. 29).  And the following day, Ms. Lawrence wrote again to the same individual: "Neither of us were aware of the high blood pressure pregnancy until after the fact. Upon investigation if this is indeed true, we may need to bring her back."  (*Id*., Ex. 30).  It is undisputed, however, that Ms. Henderson, Triple Creek's Assistant Director of Nursing, *was* aware of the high blood pressure pregnancy at the time.

On or about September 3, 2010, Ms. Lawrence called Plaintiff to request a physician's note explaining her absence.  (Doc. 19 at 16-17).  Ms. Lawrence received that note on September 7, 2010, via facsimile transmission directly from Plaintiff's physician.  (*Id*. at 17).  It was the same note the physician's office had sent to Triple Creek on August 24, 2010, stating that Plaintiff was under care from August 23, 2010 to August 27, 2010 "due to elevated BP in pregnancy."  (Doc. 23, Ex. 4).

According to Ms. Lawrence, the remainder of her investigation consisted of a discussion with Melanie Crozier.  (Doc. 19 at 18-19).  Trilogy never again contacted Plaintiff to obtain her version of events, to request a more complete physician's statement, or to lift her suspension.  (*Id*. at 18, 33).  Ms. Crozier acknowledged that an employee's

-10-

only obligation once suspended is to contact Trilogy's corporate office, which Plaintiff did immediately.  (Doc. 21 at 47).  However, she noted that on August 23 and 24, 2010, Plaintiff called off two days in a row and when she put Plaintiff on suspension pending an investigation, Plaintiff replied: "don't bother, the end result will be the same."  (Doc. 20, Ex. 18).

Ultimately, Trilogy concluded its investigation and terminated Plaintiff effective October 26, 2010.  (Doc. 17, Ex. 25).  Trilogy considered Plaintiff to have abandoned her job because it never received FMLA paperwork.  (Doc. 19 at 33).  On October 22, 2010, Plaintiff filed a Charge with the Equal Employment Opportunity Commission ("EEOC") which was dismissed by the EEOC on March 31, 2011.  On May 6, 2011 Plaintiff filed the present lawsuit.

### III.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter fo law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of showing, by identifying specific evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," that there exists no genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the movant meets

its burden, it is then the opposing party's duty to "set forth specific facts showing there is a genuine [dispute] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(a).

The requirement that the dispute be "genuine" is emphasized. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. Therefore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252. Furthermore, the non-moving party may not merely rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment  -  rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV.   ANALYSIS

### A.   Pregnancy Discrimination (Counts II and III)

Plaintiff alleges that she was discriminated against on the basis of her pregnancy in violation of state and federal law.[2]

The Pregnancy Discrimination Act ("PDA") amended Title VII to specify that sex discrimination under Title VII includes discrimination on the basis of pregnancy.  42 U.S.C. § 2000e(k).  By incorporating the PDA into Title VII, Congress manifested its belief that discrimination based on pregnancy constitutes discrimination based upon sex. The PDA requires that "one affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  42 U.S.C. § 2000e(k).  As the Sixth Circuit has held, "[w]omen who are affected by pregnancy, childbirth or related medical conditions are required to be treated the same, for all employment purposes, as other persons not so affected but who are similar in their ability or inability to work."  *Tysinger v. Police Dep't of the City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).  "[T]he Pregnancy Discrimination Act does not require preferential treatment for pregnant employees.  Rather, it mandates that employers treat pregnant employees the same as nonpregnant employees who are similarly situated with respect to their ability to work."  *Id.* at 575.

---

[2]  Claims brought under Ohio Rev. Code 4112 are analyzed identically to claims brought under Title VII.  *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 471-71 (6th Cir. 2005).

-13-

### 1.    *Prima facie case*

In order to establish a *prima facie* case of pregnancy discrimination, Plaintiff must show: (1) that she was pregnant; (2) that she was qualified for her job; (3) that she was subjected to an adverse employment action; and (4) that there is a causal connection between her pregnancy and the adverse employment action.  *Tysinger*, 463 F.3d at 573.[3] In the absence of direct evidence, a plaintiff may also satisfy the fourth element by showing that she was treated less favorably than other employees similar in their ability or inability to work.  *Id.* at 573-74.  "[T]o satisfy the fourth element, [Plaintiff] is required to demonstrate that another employee who was similar in her or his ability or inability to work received the benefits denied to her."  *Id.*  Defendant only challenges the fourth element – that there is a nexus between Plaintiff's pregnancy and the adverse employment action.

If plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for its decision.  *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 641 (6th Cir. 2006).  Plaintiff then has the burden of showing that the articulated reason is in reality a pretext for illegal discrimination.  *Id.*

---

[3]  "The *prima facie* requirement for making a Title VII claim 'is not onerous,' and poses 'a burden easily met.'"  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

### a.    Temporal proximity

Temporal proximity between an employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee, is sufficient to support an inference of pregnancy discrimination.  *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006).  However, "proximity alone may not survive summary judgment . . . nor does it necessarily imply causation." *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir. 2002).

Plaintiff's annual review, completed in April 2010, one month before Plaintiff informed Defendant she was pregnant, stated: "Tasha is a wonderful nurse, loves her residents, and her team.  Tasha is a team player . . . She follows direction [and] pays attention to details.  Tasha leads by example [and] always encourages her co-workers. Tasha is a very well rounded nurse, that truly lives the Trilogy culture.  She is a devoted staff member."  (Doc. 18, Ex. 1).  Plaintiff informed Trilogy that she was pregnant one month later in May 2010, and she was suspended in August 2010 – approximately three months later.  Additionally, Plaintiff was the subject of three performance based disciplinary actions in the span of one month (July 8, 2010, August 5, 2010, and August 18, 2010).  Prior to the first disciplinary action, Plaintiff had only received one disciplinary action for attendance, and it had been expunged from her record.

Accordingly, the Court finds that these facts support an inference of pregnancy discrimination, that when considered in the aggregate with all other evidence (*see infra*), supports a *prima facie* case for pregnancy discrimination.

### b.     Negative Comments

Plaintiff also alleges that Defendant made negative comments about her pregnancy and related medical conditions.

Melanie Crozier, Triple Creek's Director of Health Services, allegedly commented during a meeting that she was "concerned' that both Plaintiff and another nurse, Stephanie Ware, were both pregnant and due to take maternity leave at approximately the same time.  (Doc. 26, Ex. N at ¶ 3).  Ms. Ware and Plaintiff shared a position, performing the same job on different days.  Ms. Crozier allegedly expressed concern about not having a sufficient number of nurses when both Plaintiff and Ms. Ware were on maternity leave. (*Id*.)  Ms. Ware noted that based on her experience, the facility would have faced a staffing problem if both she and Plaintiff were on maternity leave at the same time.  (Doc. 24 at 16).

Ms. Ware also testified that Cheryl Henderson, Triple Creek's Assistant Director of Health Services, made numerous negative comments about Plaintiff's pregnancy and related absences.  Ms. Henderson allegedly commented that she did not believe Plaintiff's absences were actually due to her pregnancy-related illness, but rather that Plaintiff was simply truant and using her pregnancy as an excuse.  (Doc. 24 at 12-13).  Ms. Ware noted that Ms. Henderson told her that Plaintiff would not be employed with Triple Creek much longer.  (*Id.* at 13).  Ms. Henderson also allegedly told Ms. Ware that she had been encouraged to terminate Plaintiff, and that as a result, management was "watching her

closely" and "everything she was doing was going on to record because they had to have the paper trail in order to get rid of her."  (*Id*. at 14).[4]  Ms. Ware acknowledged:

> Q.    So was your – Every time you heard Cheryl or other management discuss getting rid of Tasha, it was always in conjunction with them discussing her pregnancy?
>
> A.    Yes.

(*Id*. at 14-15).

Defendant maintains that even if Henderson's alleged comments were true, they merely suggest Henderson had contemplated staffing numbers.  Moreover, if Henderson's "concern" related to low staffing on the night shift, she would not be motivated to suspend or terminate Plaintiff, because she would need the help in staffing.

 Taken in the light most favorable to the nonmoving party, the Court finds that these comments constitute evidence of a motivation to discipline Plaintiff because of her pregnancy.

---

[4]  With respect to Ware's comments regarding Triple Creek management creating a paper trail to terminate Plaintiff, she also testified that the Company took this action generally for other employees as well:

> A.    She [Ms. Henderson] had said it about several other people also, but just in general that, you know, to fire someone we need to have a paper trail.
>
> * * *
>
> Q.    So when she told you, she told you that when other people were terminated, they also needed a paper trail to do those terminations as well?
>
> A.    Yes.

(Doc. 24 at 24).

### c.    Pattern of terminating pregnant employees

Evidence that other persons in the same protected class also suffered adverse employment actions is relevant to demonstrate a discriminatory animus.  *Geiger v. Pfizer, Inc.*, No. 2:10cv106, 2012 U.S. Dist. LEXIS 11599, at *8-9 (S.D. Ohio Apr. 15, 2009). Trilogy also terminated Ms. Ware, who was pregnant.  Like Plaintiff, Ms. Ware found herself subject to a number of disciplinary actions in rapid succession.  (Doc. 24 at 19). Ms. Ware was also terminated by Ms. Crozier, the same person who terminated Plaintiff. (Doc. 20 at 90-91).  Trilogy terminated two pregnant employees in two months.

Defendant argues that Stephanie Ware's termination does not evidence a motivation to terminate Plaintiff based on her pregnancy.  "'[M]e too' evidence is relatively unwelcome in this Circuit."  *Geiger*, 2009 U.S. Dist. LEXIS 34982, at *23.  *See also Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 156-57 (6th Cir. 1988) (finding that a plaintiff generally must show that the same actors, reasons, and other circumstances were involved in order for such evidence to be admissible).  Additionally, Defendant maintains that Lawrence terminated Plaintiff from its system, and not Ware, so the same actors were not involved.  Moreover, Defendant claims that the circumstances for Ware's termination are significantly different from Plaintiff's.  Crozier allegedly terminated Ware after she and Ware had an argument about Ware's alleged bad attitude and Ware threw a disciplinary action (piece of paper) at her.  (Doc. 20 at 90, 96; Doc. 24 at 20).

Still, based on the circumstances and temporal proximity, reasonable minds could conclude that Trilogy terminated Ms. Ware and Plaintiff because of their pregnancies.

### d.      Similarly situated employees

Additionally, Plaintiff argues that four "similarly-situated" non-pregnant employees were treated more favorably than her: Catherine Reed, Trisha Detherage, Sally Otis, and Stacy Moonitz.  Defendant's records establish policy violations by these employees without discipline:

1.      Trilogy employee Catherine Reed called at 10:50 p.m. to notify the company that she would be tardy for an 11:00 p.m. shift on February 17, 2017.  She was not disciplined.  (Doc. 23, Ex. B-4).

2.      Trilogy employee Trisha Detherage called at 7:10 p.m. to notify the company that she was unable to work an 11:00 p.m. shift on December 7, 2010.  She was not disciplined.  (*Id.*)

3.      Trilogy employee Sally Otis called at 10:55 p.m. to notify the company that she would be tardy for an 11:00 p.m. shift on February 17, 2010.  She was not disciplined.  (*Id.*)

Ms. Ware, who was responsible for taking calls from Trilogy employees who called in absent or tardy, testified that employees often called off with less than four hours of notice.  (Doc. 24 at 7, 10).  Ms. Ware testified that to her knowledge, no employees were even disciplined for not calling in four hours in advance of a shift if they intended to be late or absent.  (*Id.* at 10).  Plaintiff testified that she fielded a call from an employee, Stacy Moonitz, who called off of work less than one hour before her shift was to begin due to a headache, but did not receive any discipline.  (Doc. 21 at 54).  In fact, Defendant admitted that it has never disciplined any LPN at the Triple Creek facility for violating this rule.  (Doc. 23, Ex. B-10).

-19-

Defendant maintains that Plaintiff was "treated the same as all non-pregnant employees who violated Trilogy's policies with regard to resident care."  (Doc. 22 at 17). Specifically, Defendant claims that Reed and Otis' circumstances are not materially similar to Plaintiff because their call-ins related to being late for the shift, not calling off entirely.  *Rutherford v. Britthaven, Inc.*, No. 10cv5783, 2011 U.S. App. LEXIS 25806, at *10-11 (6th Cir. 2011) ("The individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").  Moreover, Defendant argues that Plaintiff set forth no evidence that the identified employees were similarly situated in all relevant aspects.  Specifically, there is no evidence that the employees had limitations on their ability to work, like Plaintiff.

Again, considering all of these facts in the aggregate, Plaintiff has proffered sufficient facts to support a causal connection between her pregnancy and the adverse employment action.  Accordingly, Plaintiff has alleged a *prima facie* case of pregnancy discrimination.

### 2.    *Legitimate non-discriminatory reason for termination*

Once plaintiff articulates a *prima facie* case, "[t]he burden that shifts to the defendant . . . to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory

reason . . . To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Defendant maintains that Plaintiff was terminated because she provided poor care to the residents of Triple Creek, had multiple attendance violations, and after August 26, 2010, never spoke to anyone at Triple Creek again, applying for unemployment benefits that same day. (Doc. 27 at 1).[5] Additionally, Defendant alleges that Crozier suspended Plaintiff pending an investigation, yet Plaintiff told her not to "bother" and did not meet with Crozier. Defendant considered Plaintiff to have abandoned her position, so it terminated her in its system on October 26, 2010 for the exclusive reason: "Job Abandonment." (*Id*.)

Accordingly, the Court finds that Defendant has proffered a legitimate nondiscriminatory reason for Plaintiff's termination.

### 3.  *Pretext*

A plaintiff can establish pretext in three ways – by showing that the proffered justification: (1) had no basis in fact; (2) did not actually motivate the decision, *e.g.*, was not the actual reason; or (3) was insufficient to warrant the decision. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009).

---

[5] However, Plaintiff did speak to Linda Lawrence, in Human Resources at Trilogy's home office, after August 26, 2010. (*See* Doc. 27 at 5).

First, Plaintiff argues that Defendant's proffered legitimate, non-discriminatory justification for suspending her is not based in fact.  On the evidence, reasonable minds could so conclude.

Defendant proffered as its sole legitimate non-discriminatory justification for suspending Plaintiff: "Plaintiff's poor performance in violation of Trilogy's care and attendance standards was a legitimate, non-discriminatory reason for Crozier's suspension of Plaintiff (while she initiated an investigation)."  (Doc. 22 at 25).  However, Defendant did not cite to any admissible evidence for the proposition that it actually took any adverse action against Plaintiff for those reasons.  Specifically, Ms. Crozier testified that her decision to suspend Plaintiff was motivated by Plaintiff's failure to provide four hours of notice for her absence on August 24, 2010 – although she indisputably informed Ms. Henderson that she could not report to work because her blood pressure was elevated and her physician had instructed her not to work that evening.  (Doc. 20 at 24).  In fact, Ms. Henderson, Triple Creek's Assistant Director of Health Services, admitted that being diagnosed with high blood pressure was an excusable reason for an employee to call off of work less than four hours before the scheduled beginning of a shift.  (Doc. 18 at 76-77).[6]  Additionally, Ms. Cozier testified that, Plaintiff had not accumulated enough occurrences under Defendant's attendance policy to warrant any discipline, much less suspension or termination as of August 26, 2010, the day she was suspended.  (*Id.* at 68-

---

[6] Defendant's attendance policy states that the rule may not apply if a valid excuse is provided.  (Doc. 20, Ex. 20).

-22-

69).[7]

Second, Plaintiff has identified evidence that Defendant was motivated by other factors when construed in her favor – specifically, the negative comments made about Plaintiff's pregnancy and related health conditions.

Therefore, considering all of the facts in the light most favorable to Plaintiff, she has alleged sufficient facts to maintain a claim for pregnancy discrimination.  However, disputed facts still remain.  Accordingly, Defendant's motion for summary judgment on the pregnancy discrimination claims is denied.

## B.    Disability Discrimination (Counts IV and V)

Next, Plaintiff alleges that she was subjected to an adverse employment action when Defendant denied her "a reasonable accommodation" of a short period of leave for her "chronic hypertension," in violation of the ADA[8] and Ohio's anti-discrimination statute.[9]  (Doc. 1 at ¶¶ 39, 41, 42, 46, 48, 49).

---

[7] Defendant argues that the pretext argument fails because it did not *terminate* Plaintiff for her performance and attendance problems – it *terminated* Plaintiff exclusively for her "Job Abandonment."  However, that does not resolve the issue with respect to Plaintiff's *suspension* – there is no legitimate non-discriminatory reason for Defendant's adverse employment action *suspending* Plaintiff.

[8] "Courts are to conduct an individualized inquiry and under appropriate circumstances, a medical leave of absence can constitute a reasonable accommodation."  *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 782-83 (6th Cir. 1998)

[9] Federal and state disability discrimination claims are subject to the same evidentiary standards and may be evaluated concurrently.  *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010).

The ADA defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).[10]  The McDonnell-Douglas burden-shifting analysis does not apply to Plaintiff's disability claims because "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination."  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).  In such cases, the employer's intent is not determinative.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996).  "When an ADA plaintiff premises [her] claim upon direct evidence, we jettison the familiar McDonnell Douglas burden-shifting framework applicable in indirect-evidence cases . . . and we analyze the claim under the following framework:

(1)   The plaintiff bears the burden of establishing that he or she is disabled.

(2)   The plaintiff bears the burden of establishing that he or she was 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation.

---

[10]  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1).  It is undisputed that Plaintiff suffered from preeclampsia.  (Doc. 23, Ex. D at ¶ 3).  Preeclampsia is a physiological disorder that affects the cardiovascular and urinary systems.  29 C.F.R. § 1630.02(h)(1).  Plaintiff must also demonstrate that her impairment substantially limited one of her major life activities or the operation of a major bodily function.  42 U.S.C. § 12102(2).  Plaintiff's preeclampsia substantially limited the operation of her circulatory and urinary functions because it caused her blood pressure to reach a dangerous 180/100 and protein levels in her kidneys to rise to dangerous levels as well.  (Doc. 23, Ex. D at ¶ 4).

> (3)     The employer will bear the burden of proving that a challenged job criterion
> is essential, and therefore a business necessity, or that a proposed
> accommodation will impose an undue hardship under the employer."

*Kleiber*, 485 F.3d 869.

Defendant does not challenge that Plaintiff suffered from a disability or that she was otherwise qualified for her position as a nurse at Triple Creek. Rather, Defendant maintains that it had no obligation to provide Plaintiff with a reasonable accommodation, because Plaintiff simply never asked for one. Plaintiff has the initial burden to request a reasonable accommodation. *Tubbs v. Formica Corp.*, 107 F. Appx. 485, 488-89 (6th Cir. 2004) (an employee's failure to accommodate claim must be dismissed if the employee fails to identify and request such reasonable accommodations).

Plaintiff alleges that she required a brief leave of absence to stabilize her pregnancy-related hypertension. Plaintiff maintains that she requested a three-day leave of absence as an accommodation when she called Cheryl Henderson on August 24, 2010, to inform her that she could not work that evening due to pregnancy-related hypertension. Plaintiff maintains that she told Ms. Henderson: "my blood pressure is extremely high and my doctor wants me off of work tonight. She's going to release me back on the 27th." (Doc. 21 at 39-40). Ms. Henderson describes the conversation as follows:

> Q.     Okay. Do you recall receiving a call from Tasha from her doctor's office
> saying that she couldn't work one evening cause her blood pressure was too
> high?

> A.    I remember Tasha calling me, not her doctor's office calling me, or where she was, I couldn't tell you.  But she told me her blood pressure was up, and they had taken her off.  And I said, okay, feel better; and marked it down.

(Doc. 18 at 64).

> Q.    Did she tell you that she – her doctor had advised her not to work for a few days at that time?
>
> A.    No.

(*Id.* at 65).  Accordingly, Ms. Henderson's testimony does not support Plaintiff's allegation that she requested "a short, three-day leave of absence as an accommodation."

However, in addition to requesting an accommodation from Ms. Henderson, Plaintiff claims that a physician's note was faxed to Trilogy on August 24, 2010, stating that she was unable to work from August 23, 2010 until August 27, 2010, "due to elevated BP in pregnancy."  (Doc. 23, Ex. E at ¶ 3).  A request for accommodation from a physician triggers an employer's obligation to provide an accommodation.  *Trepeka v. Bd. of Educ.*, 28 Fed. Appx. 455, 459 (6th Cir. 2002).  Plaintiff also sent an email to Defendant's compliance department on August 26, 2010, which stated: "On 8-23-10 & 8-24-10 I was forced to call off of my shift due to a serious medical condition.  My physician actually removed me from duty until 8-27-10."  (Doc. 23, Ex. G).

An employee does not need to invoke any specific words or use any "talismanic language" in order to properly request an accommodation.  *Id.*  Nor does the request need to be in writing.  *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 313 (3rd Cir 1999).  "What matters under the ADA are not formalisms about the manner of the request, but

-26-

whether the employee . . . provides the employer with enough information that, under the

circumstances, the employer can be fairly said to know of both the disability and desire

for an accommodation." *White v. Honda of Am. Mfg., Inc.*, 191 F. Supp.2d 933, 950

(S.D. Ohio 2002).

It is clear that Defendant knew Plaintiff was suffering from a disability.[11]  It is also

clear that Defendant knew Plaintiff was precluded from working due to this disability

until August 27, 2010.  (Doc. 23, Ex. G).  Accordingly, Plaintiff was subjected to an

adverse employment action (suspension or termination) when Defendant denied her a

"reasonable accommodation" (short period of leave) for her preeclampsia in violation of

the ADA.  These facts are not disputed.

Therefore, Plaintiff's motion for summary judgment on the disability

discrimination claims are granted.

## C.     FMLA Interference (Count I)

To establish a *prima facie* claim for FMLA interference, Plaintiff must show:

(1) she is an eligible employee; (2) the defendant is an employer; (3) the employee was

entitled to leave under the FMLA; (4) the employee gave the employer notice of her

---

[11]  For example: (1) Plaintiff informed her supervisor, Cheryl Henderson, that she was pregnant in the summer of 2010 (Doc. 18 at 21); (2) Plaintiff discussed her high blood pressure with her supervisor on multiple occasions (*Id.* at 63); Plaintiff had previously missed work to undergo treatment for her high blood pressure (*Id.* at 13); (3) Ms. Henderson, a former OB/GYN nurse, independently formed the opinion that Plaintiff was suffering from preeclampsia based on her appearance and her reported high blood pressure (*Id.* at 63); and (4) Ms. Henderson admitted that Plaintiff specifically told her that she could not work on August 24, 2010 because "her blood pressure was up, and [her doctor] had taken her off of work." (*Id.* at 64).

-27-

intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled.  *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).  Defendant challenges the third and fifth elements of Plaintiff's claim.

### 1.    *Whether Plaintiff was entitled to leave*

An expecting mother is entitled to FMLA leave for incapacity due to pregnancy. 29 C.F.R. § 825.120(a)(4).  The FMLA defines "incapacity" as the "inability to work, attend school or perform other regular daily activities due to the serious heath condition, treatment therefore, or recovery therefrom."  29 C.F.R. § 825.113(b).

Defendant argues that Plaintiff was not entitled to FMLA leave because she "never applied for it."  (Doc. 22 at 28).  *See, e.g., Brady v. Potter*, 476 F.Supp.2d 745, 758 (N.E. Ohio 2007) (the employee could not state a claim for FMLA interference because she failed to complete her certification forms despite being provided with a reasonable period of time to do so).

However, the FMLA does not require that employees "apply" for FMLA leave, it only requires that employees provide employers with "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b).  The notice requirement is a "relatively easy burden to satisfy." *Edwards v. Dialysis Clinic, Inc.*, 423 F. Supp.2d 789, 795 (S.D. Ohio 2006).  Plaintiff provided sufficient notice when she told Ms. Henderson she was unable to work due to

her elevated blood pressure and because her physician instructed her not to work.[12] An employee may be required to follow more onerous employer-mandated procedures for requesting leave, but only if it is:

> clear that the employee had actual notice of the FMLA notice requirements. This condition would be satisfied by the employer's proper posting of the required notice at the worksite where the employee is employed and the employer's provision of the required notice in either an employee handbook or employee distribution, as required by Section 825.3000.

29 C.F.R. § 825.304(a).

Here, Plaintiff was not required to follow any employer-mandated procedures because she did not have actual notice of the FMLA notice requirements. (Doc. 17 at 23;

---

[12] Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligation under the Act. The employer will be expected to obtain any additional required information through informal means. An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying. Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying. 29 C.F.R. § 825.303(b).

Here, however, Plaintiff could not complete or even initiate Defendant's FMLA process, when it was not in writing as required. When Defendant requested information about Plaintiff's absence, she forwarded a letter from her doctor. She was never asked for additional documentation. In fact, Ms. Crozier admitted that she did not ask Plaintiff for medical documentation of her need for leave during the August 26, 2010 conversation in which Plaintiff was suspended. (Doc. 20 at 92). Plaintiff even offered to provide medical documentation of her need for leave during the conversation. (*Id.* at 43). Defendant also argues that Plaintiff told Ms. Crozier to not "bother" suspending her or investigating her absence. (Doc. 25 at 14). Plaintiff does not recall making this comment. (Doc. 21 at 50, Doc. 19 at 18). However, even if she did make the comment, Defendant still suspended her and conducted an investigation. (Doc. 21 at 50, Doc. 19 at 18). Moreover, if Plaintiff did not want her job, she would not have contacted Defendant's compliance department to speak with Ms. Lawrence about her absence.

Doc. 19 at 12).[13]  Defendant admits that it did not inform its employees in writing of the

procedure for obtaining FMLA leave.  (Doc. 17 at 23; Doc. 19 at 12).[14]

Defendant fails to make any argument opposing Plaintiff's assertion that its failure

to notify its employees, in writing, of its process for requesting FMLA leave, prohibited it

from denying Plaintiff's leave for not following that procedure.  29 C.F.R. § 825.304(a)

provides:

> In all cases, in order for the onset of an employee's FMLA leave to
> be delayed due to lack of required notice, it must be clear that the
> employee had actual notice of the FMLA notice requirements.  This
> condition would be satisfied by the employer's proper posting of the
> required notice at the worksite where the employee is employed and
> the employer's provision of the required notice in either an employee
> handbook or employee distribution, as required by Section 824.300.

Defendant formerly self-administered its employees' FMLA leave, and the handbook

directed employees to obtain a form from the human resource department to notify the

company of the intent to take FMLA leave.  (Doc. 23, Ex. K).  However, by August 2010,

Defendant had contracted with Matrix, an independent company to administer FMLA

leave, but failed to update the employee handbook.  Defendant simply relied on its human

---

[13]  *See, e.g., Sons v. Henry Cnty.*, No. 1:05cv516, 2006 U.S. Dist. LEXIS 79604, at *25
(S.D. Ind. Oct. 31, 2006) ("It would be unfair to allow an employer to deny FMLA leave for
failure to follow its usual and customary notice requirements if the employer never tried to make
its employees aware of its particular requirements.").

[14]  Defendant argues that Plaintiff knew other employees, including her own sister, who
had received FMLA from Trilogy and returned to work.  (Doc. 21 at 25, 28).  However, this does
not change the fact that Defendant's FMLA policy was not in writing as required.  Plaintiff
cannot be expected to rely on information from other employees who took FMLA leave in the
past.  The regulations require that Plaintiff have written notice of the existing policy.

resource representatives to notify employees of the new procedure verbally.  (Doc. 17 at 10).  Verbal notice is insufficient as 29 C.F.R. § 825.304(a) requires employers to notify employees of the FMLA notice requirements by posting them in the workplace[15] and in the employee handbook.[16]

Defendant also claims that Plaintiff was not entitled to FMLA leave because she never "began, pursued, or completed the FMLA certification process."  (Doc. 22 at 29).  The regulations implementing the FMLA clearly provide:

> An employer may require that an employee's leave to care for the employee's covered family member with a serious health condition, or due to the employee's own serious health condition that makes the employee unable to perform one or more of the essential functions of the employee's position, be supported by a certification issued by the health care provider of the employee or the employee's family member . . . An employer must give notice of a requirement for certification each time a certification is required; such notice must be written notice whenever required by § 825.300(c).  29 C.F.R.  §  825.305(a).

According to 29 C.F.R. § 825.300(c), the notice of the requirement for certification must

---

[15]  Defendant was required to post the procedure for contacting Matrix in the workplace. (Doc. 19 at 12).  Defendant argues that it generally posted FMLA information in the workplace. (Doc. 25 at 13).  However, Defendant only posted the "federal" posters, which are disseminated by the Department of Labor, and say nothing about contacting a specific person or entity or "applying" for FMLA leave.  (Doc. 19 at 12).  Defendant's employer relations support manager admitted that Defendant did not post any information concerning Matrix in the workplace.  (*Id.*)

[16]  Defendant contends that Ms. Dressler "directed" Plaintiff to contact Matrix, but verbal notice is insufficient.  Moreover, although Defendant has presented an affidavit from Ms. Dressler in which she swears she spoke with Plaintiff and "directed" her to contact Matrix, she testified in her deposition that she had no recollection of the call or conversation with Plaintiff. (Doc. 17 at 28).  A party cannot create a genuine issue of material fact by contradicting her own previous sworn testimony in an affidavit after a motion for summary judgment has been filed. *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997).

be provided to the employee in writing within five business days of the time the employee requests FMLA leave or the employer acquires knowledge that an employee's leave may be for a FMLA qualifying reason.  The employer is also required to furnish the employee with the certification form.  29 C.F.R. § 825.300(c)(3).  Again, Defendant failed to provide Plaintiff with notice of the certification process.

Accordingly, Plaintiff has submitted sufficient evidence to establish that she was eligible for FMLA benefits.

### 2. *Whether Trilogy denied Plaintiff the FMLA rights to which she was entitled.*

Defendant's assertion that Plaintiff cannot establish the fifth element of her claim is based solely on its position that Plaintiff was not entitled to FMLA benefits.  As discussed *supra*, because Defendant's argument that Plaintiff was not entitled to leave fails, so too must its argument that it did not deny Plaintiff rights to which she was entitled.

### 3. *Whether Defendant denied Plaintiff FMLA rights*

Having stated a *prima facie* case, Plaintiff claims that she was entitled to reinstatement upon the conclusion of her leave.  29 C.F.R. § 825.214.

Plaintiff was scheduled to return to work on August 27, 2010, which was her next scheduled work day, but on August 26, 2010, Ms. Crozier informed her that she had been removed from the schedule and suspended.  In response, Plaintiff contacted Defendant through its compliance department and requested assistance.  Defendant contacted

Plaintiff on one occasion, requesting a physician's note documenting her need for leave, which she provided.  However, Defendant never contacted Plaintiff again and after concluding its investigation on October 26, 2010, terminated her.

Accordingly, Defendant violated the FMLA by failing to reinstate Plaintiff to her same position or an equivalent position upon the conclusion of her leave.  Therefore, Plaintiff is entitled to judgment as a matter of law.[17]

## V.   CONCLUSION

For the reasons stated here:

(1)     Defendant's motion for summary judgment (Doc. 22) is **DENIED**; and

(2)     Plaintiff's motion for partial summary judgment on her disability discrimination and FMLA claims (Doc. 23) is **GRANTED**.

(3)      Plaintiff's claim for pregnancy discrimination remains pending for trial.

**IT IS SO ORDERED.**

Date:  October 23, 2012                                      *s/ Timothy S. Black*
                                                                        Timothy S. Black
                                                                        United States District Judge

---

[17]  "[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct."  *Edgar v. JAC Prods.*, 443 F.3d 501, 507 (6th Cir. 2006).  Defendant fails to present any legitimate reason for denying Plaintiff FMLA leave, aside from the argument that Plaintiff did not request FMLA leave.  This reason is not "unrelated to the exercise of FMLA rights" and therefore does not suffice.